The following is the evidence in the case:
Thomas J. Green, the prosecutor, was introduced as a witness for the State, and testified: I am Captain of a steamboat plying between Fayetteville and Wilmington. On the night of the 11th of August, 1874, my dwelling house on Person street, in Fayetteville, was forcibly entered by prizing open the blinds of a window on the east side of my house. These blinds I had hooked myself the evening before, and left the sash up for air. On the next morning I noticed my axe lying on the ground under the window. A goods box was also under the window and a chair beside it so as to form steps. I noticed *Page 347 
a slight impression or dent in the blinds, and signs of dirt as if from the axe. This was the sleeping room of my little daughter, aged twelve years, and of the nurse. The next morning I found these were the only window blinds open — they were pushed too, but the wrong one first, so as not to shut up tight. The rest of the windows were all closed and the doors were all locked. I had closed and fastened these windows myself before lying down. My own family, consisting of myself and wife and five children, were all at home We also had a guest with us that night, named Mrs. Carver I was the first one to rise next morning. I rose when it was clearly light, between daylight and sunrise. I lost my vest which I had hung up the night before in the passage at my bed room door, and with it my watch which I had left in my vest job. I also missed my overcoat and $50 in currency. This money was in a memorandum book, which I had handed to my wife the day before. I found the book on the parlor mantle, but no money. The watch was a fine gold lever watch, with thick hunting case. It was of the make of S. J. Tobias Co., Liverpool, No. 32,398; on one side a landscape was engraved and on the other a sportsman in the act of shooting a deer. The hands were large steel hands, unusually large, which I had put on specially to see at night. The watch cost $180, and was 18 carats fine. My kitchen was connected with my dwelling, forming an L, and is sixteen feet from my dwelling. It was entered that same night. The nails over the window sash were broken and the sash was taken out. I think I would recognize my vest, (a vest was then shown to the witness.) This is my best which my watch was in. I found this vest in a trunk at the prisoner's house, on the 11th or 12th of December last. The trunk was locked, the key could not be got, and the officer broke open the trunk, the prisoner not being present. We found in the trunk this vest; there were also in it an old coat and pants. We saw another trunk there, the key to which we found; it contained the regular clothing of the prisoner. I certainly recognize this vest as the one *Page 348 
which contained my watch. I had the prisoner, Robert McDonald, arrested by an officer acting under a State's warrant, at a house four miles from Fayetteville. I had a conversation with the prisoner on our way to town.
The State's counsel proposed to give this conversation in evidence. The counsel for the prisoner objected, and thereupon in reply to questions asked him, the witness answered as follows: The prisoner seemed anxious to communicate. I made no threats, but spoke mildly to him and used no harsh words. The prisoner's counsel then remarked, "It appears no threats were used and that the statement was voluntarily made, the objection is withdrawn."
The witness then further testified: The prisoner then stated that he bought this vest, a bucket of butter and a piece of cheese, weighing five or six pounds, on Friday night, the 4th of December last, between ten and eleven o'clock at night, of a colored man named William Richardson. I asked if this was all he bought. He answered, "yes." I asked, "Robert, did you ever have my watch?" He answered, "Not as I know of, I sold a watch for William Richardson in September last." He then described my watch nearly as accurately as a jeweller would have done it, except the number. I think the prisoner knew my watch, he had seen it time and time again. He had been with me on my boat from 1870, off and on. His name is on my pay roll from that time, at intervals. I asked Robert, "What did you get for the watch?"
Here the prisoner's counsel renewed the objection to the admission of the conversation, on the ground that the prisoner was under arrest on a criminal charge, was then actually in the custody of the officer, and was not notified that his answer would be used against him as was admitted by the witness. Upon this ground the counsel for the prisoner moved the Court to exclude the whole conversation, both that which was already in evidence, and that which follows.
His Honor ruled that the State was entitled to introduce the whole of the conversation on that occasion, in evidence especially *Page 349 
after a part of the same had been given in evidence upon a withdrawal of objection by the prisoner's counsel. To this ruling of his Honor the prisoner excepted.
The witness then further testified:
He answered, "Twenty dollars." I asked, "To whom did you sell it?" He answered, "To the captain of a vessel." I asked if he knew his name; he replied that he did not. I asked if he could tell me where the vessel was lying. He answered. "At or near the old New York steamship wharf, in Wilmington." This is a wharf near against the wharf of Worth Worth. I said "Robert, it could not have been possible you sold that watch for $20?" He said, "Yes sir." I said, "Did you know it was a gold watch?" He said he did not know it, but thought it was, that Richardson told him if he could get $20 for it to sell it; that it was a galvanized watch; he had won it gambling. I asked, "Robert, are you telling me the truth? that was a fine gold watch, and I prized it highly. It was a present; can't you put me in the way of recovering it?" He said, "Captain, I sold it." The prisoner lived about a mile from me. I saw him here about election time in August, a few days before. He worked about the river. The pay of a deck hand is $16.50 per month.
Upon cross examination the witness testified as follows:
The prisoner worked for me last Spring, (1874,) a short while. He worked for me some every year since 1870. He had not worked for me regularly for the last two years. He worked more for me in 1871. William Richardson, the colored man to whom the prisoner referred, has worked for me regularly for the last two years; he has not lost ten days. When my boat would come up the river, I usually sent some of the hands, when there was nothing else to do, to my house to saw wood. Richardson was up at Fayetteville the night my house was robbed. He frequently chopped wood at my house. He claimed to stay at Allen Harris', near the flour warehouse, one hundred yards from my house. I had Richardson arrested and put in jail for this same charge. The prisoner was arrested *Page 350 
first, and on the same evening I had Richardson arrested. All I had against Richardson was the prisoner's statement. Both were put in jail. I had before this caused the arrest of two other men, Abram Williams and Adam Jessup, who were both discharged. William Richardson was used as a witness. I had twelve boat hands under me. I carried the watch before the war. Richardson had as good a chance to see my watch as the prisoner. I have stood with this watch in my hand, timeing [timing] boat hands in rolling barrels. I would not swear the prisoner ever saw the hands of the watch, or the engraving of the hunter on the case. I have never seen my watch since it was stolen. I did not see the vest from the time it was taken, on the 11th of August, at night, until I saw it in the prisoner's house, two weeks after the 4th of December, on Friday. I did not tell the prisoner what he was arrested for. I did not tell him I had got my vest. He told me, without hesitation, about his getting the things from Richardson. Richardson was in town the night my house and kitchen were robbed, and the next day.
Upon re-direct examination the witness testified: The prisoner said the butter was in a tin package, sealed up like a paint can. I asked, "What did you do with this package?" He said, "We used a part and I carried the balance to my sister the day before." This conversation occurred the day of his arrest on a Friday, two weeks after the 4th December, 1874, being the 18th of the month. I did not lose cheese and butter on the occasion of my house being entered on the night of the 11th of August, but on a subsequent occasion when my house was entered again by some one. The prisoner described the watch as having a white face, large steel hands and ordinary chain worn smooth.
Capt. Oldham was introduced as a witness on behalf of the State, and testified as follows: I know the prisoner. I saw him in Wilmington on the 12th of September last, on board of a vessel run by Captain Lyons, lying at Lippitt's wharf. I then saw in the hands of the prisoner on board the vessel a *Page 351 
doubled cased watch with a landscape engraved on one side, and on the other a hunter, a deer, and a dog. It had a white face and large steel hands; its number was 32,398. I made a memorandum at the time. I asked the prisoner his object in selling. He said he was then away from home, without money, and sick, and wanted money to get home with, and that he lived in Charleston; that he would take $75 for it, but would prefer to pawn it for $20, as he had owned it a long time, and hated to part with it. I asked what guarantee he would give that the watch would not be called for. He answered that he had owned the watch a long time, and swinging it around his head said, he would not be afraid to show it in any city. I asked him to give me the names of some people living in Charleston. He mentioned some names. I did not know them. I knew such names in Wilmington. I am not acquainted in Charleston. When I went up to him, he had the watch and chain both in his pocket out of sight. I went to question him in consequence of information I had received. I afterwards, during the same day, searched the wharf for the prisoner, and could not find him. Search was also made by detectives, but we did not find him.
Upon cross examination, the witness testified: I never saw the prisoner before the 12th of September last. I took down the number of the watch. A man came to me and asked me to go and look at the watch. It was Capt. Lyons of the schooner. I told the prisoner that $75 was more than I would give for the watch. Capt. Lyons was on board the vessel when I got there. So was the prisoner. I told Capt. Lyons I had come to see the watch, and he pointed out the prisoner to me. I went up to the prisoner, and asked to see the watch he wanted to sell. I do not know whether Capt. Lyons bought the watch. I left the prisoner on board. I was there some fifteen minutes. I did not search any house in Wilmington for the prisoner. I did not take down the name of the maker of the watch.
William Richardson, a witness for the State, testified as follows: I have been working for Capt. Green for three years. I *Page 352 
never sold a vest, or butter, or cheese to Robert McDonald. I never gave him a watch to sell.
Upon cross-examination the witness testified: I live below the flour warehouse. I work for Capt. Green on the boat, and sometimes cut wood for him at his house. I came up the river the morning of that night on the boat with Capt. Green. That night I was out between 11 and 12 o'clock. There was a little festival going on in town that night. I went there and got home 11 or 12 o'clock. This was the night of the last robbing. On the night of the first robbing there was a procession in Fayetteville, and it was a raining. I was in the street awhile burning barrels. I was at Capt. Green's next morning about 7 o'clock. I lived one hundred yards off. I had heard up the street about the robbing and I went in to see and look about. I saw they had robbed the house. I was arrested by the deputy sheriff the same day the prisoner was, while I was work on the boat. I proved where I was. Ned Gilmore was one of my witnesses. Julius Evans and Sam Jones proved where I was. They were examined by Squire Whitehead. The prisoner did not get any of the things from me. I know Capt. Green's watch because it was a watch he had a long time and I saw it so often. He pulled it out so often when I worked under him. It had a white face and the largest steel hands I ever saw on a watch. It was a double case gold watch. I never had hold of it. It had a heavy gold or plated chain. I have vests, (the witness had on no vest at the time. I never sold any to the prisoner. I came from Bladen county and formerly belonged to Dr. Richardson. I used to run on the railroad train, but my partner got his arm cut off and I quit. His name was Wash. Chapman. We were train hands.
Upon re-direct examination the witness testified: I asked the prisoner while we were in jail, why he had me put in jail for nothing? He said somebody like me brought the thing to him. The prisoner was not working on the boat when this happened. *Page 353 
Joseph A. Worth, a witness for the State, testified: On one occasion after the prisoner was committed to jail by the Justice of the Peace, I went to see him in company with the deputy sheriff and Captain Green, to get information about Captain Green's watch. The prisoner was told he was not bound to answer, and that anything he said might be used against him. I asked him where he got the ten dollars in money he had sent his wife.
The prisoner objected to the evidence of the witness, on the ground that he was a witness and also foreman of the grand jury that passed the bill which was now being tried. The counsel for the prisoner took the ground that he was on that account an incompetent witness, as presiding officer of the grand jury, he was, in effect, a judge and could not also be a witness in a case before him. The witness stated that he was foreman of the grand jury and had been sworn as a witness and examined before the grand jury, but did not vote upon the bill. The rest of the grand jury were all present and voted aye on the bill. There was no dissenting voice. It was usual when there was any dissenting voice, to require a division. There was no dissenting voice and no division in this case. His Honor overruled the objection and the prisoner excepted.
The witness then testified: The prisoner in reply to my question, said that he had carried $4.00 away from her with him and had earned the other six on the wharf in Wilmington. I asked him if he really did sell the watch to the Captain of the vessel? He answered "Yes."
Upon cross-examination the witness testified: I was present at the trial before Squire Whitehead, the examining Justice. Both Richardson and the prisoner were charged. Gilmore was examined, but not as to an alibi for Richardson. Julius Williams was there. Richardson was examined.
Upon re-direct examination the witness testified: I have known the prisoner for several years. His means are limited, he is a laboring man and lives by work. *Page 354 
Thomas J. Green was recalled by the State and testified: I think I know the general character of the witness William Richardson. His associates think well of him. I have never heard him accused of stealing.
Upon cross-examination, the witness stated that he had Richardson arrested about this matter.
The counsel for the prisoner asked the Court to charge the jury:
1. That there is no evidence that the house of the prosecutor, Captain Thomas J. Green, was broken and entered in the night time; that in a charge of this nature time was a material circumstance to be established, and by direct and positive testimony, and not by mere inference.
2. That the possession by the prisoner was not a recent possession, so as to raise a presumption in law that the prisoner stole them.
His Honor declined to give the first instruction prayed for and charged the jury in relation thereto as follows:
"That it was absolutely necessary for the State to prove to the entire satisfaction of the jury, that the breaking and entering was done in the night time, that is, at a time when there was not day light enough to discern a man's face in the yard. That it was competent to prove this, as well as other indictments of burglary, by circumstantial evidence. The effect of the evidence however must be so convincing on the minds of the jury, as the sworn evidence of a credible eye witness. The jury are not to jump at conclusions. In this case there is some evidence to be considered by the jury, that the breaking and entering was done in the night time. The circumstances detailed in the evidence, tending to show this, have been referred to by the counsel on the part of the State, viz: the early hour when the discovery was made by Captain Green that his house had been entered and robbed, stating that he rose when it was cleverly light, between day-light and sunrise, the preparation made for effecting the enterance, [entrance] the getting together *Page 355 
under the window, the axe and box and chair, involving the expenditure of time in making these arrangements, the time taken in effecting the entrance and completing the robbery in the house, the situation of the house on a public street in Fayetteville, involving exposure if the entrance had not been effected in the dark." These circumstances were pressed upon their attention by the counsel to satisfy them that the breaking and entering was done in the night time. The State must satisfy the minds of the jury upon this point beyond a reasonable doubt, otherwise a conviction of burglary is out of the question.
To this charge of his Honor the prisoner excepted.
His Honor gave the second instruction prayed for, but added:
"While the possession by the prisoner of the watch and vest, owing to the lapse of time since the loss, was not a recent possession, so as to raise a legal presumption of guilt, yet the fact of possession was a circumstance to be considered along with the other circumstances of the case, in determining the question whether the prisoner was guilty of the larceny. Whether those circumstances were proved and what weight they were entitled to, it was a question for the jury to say. Among these was the circumstance that the articles, the vest and watch, stolen from the house at the same time, are found in the possession of the prisoner; that one of the articles, the watch, was of a nature and value unsuited to the means and condition in life, of the prisoner; that he was contradicted by William Richardson, in his account as to how he came by these articles. The conflicting character of his own statement in reference to the watch, made to Green and Oldham."
To the foregoing portion of his Honor's charge, the prisoner excepted, especially to his Honor's including in the enumeration of circumstances "that one of these articles, the watch, was of a nature and value unsuited to the means and condition in life of the prisoner."
The jury returned a verdict of "guilty of burglary," and thereupon the prisoner moved for a new trial. The motion *Page 356 
was overruled and the prisoner moved in arrest of judgment upon the ground:
1. Because the indictment was concluded at common law, whereas it should have concluded "against the form of the statute."
2. Because the indictment charged that the breaking and entering was for the purpose of committing a larceny; whereas the offense of burglary consists in breaking and entering for the purpose of committing a known felony.
The motion in arrest was overruled and judgment of death pronounced by the Court, from which judgment the prisoner appealed.
None of the objections raised by the counsel of the prisoner are available to him.
1. The confessions of the prisoner were voluntary and admissible, even without the consent of the counsel; but when the counsel withdrew his objections and allowed the greater part of the conversation between the witness and the prisoner to be given in evidence, he had no right, by removing the objection, to exclude a part or the whole. State v. Davis,63 N.C. 578.
2. We know of no rule of evidence which excluded the testimony of Worth because he was a grand juror, even if he had acted as such in finding the bill. But when it appears that he declined to act or vote on the bill, because he was a witness, there is no ground of objection to his competency.
3. The counsel for the prisoner asked the Court to instruct the jury that there was no evidence that the breaking was in the night time. This was properly refused, because there was much evidence given, going to show that the breaking and entry were in the night time. The evidence is set forth in the case, and we think it fully sustains the ruling of the Court; *Page 357 
and when the Court proceeded to charge the jury that they must be satisfied, beyond a reasonable doubt, that the breaking and entry were in the night time, it was then for them to say from the evidence how the matter was.
4. The Court was asked to instruct the jury that the possession of the watch proved, was not such a recent possession as raised the presumption of law, that the prisoner was the thief. This instruction was given, but the jury were told that this possession of the stolen article, was a fact which they might consider with the other facts, upon the question of his guilt. In this there was no error.
5. The counsel moved in arrest of judgment, because the indictment concluded at common law, when it should have concluded against the statute.
This objection is disposed of by this Court in the case of the State v.Ratts, 63 N.C. 503. When the offence is made of a higher nature by statute than it was at common law, the indictment must conclude against the statute; but if the punishment is lessened, it need not so conclude. In our case the offence of burglary is the same that it was at common law, and the punishment is neither greater or less than it was at common law, but the same. The conclusion of the indictment was therefore proper. The other objections made in the record have no force in them, and were not insisted upon in this Court.
There is no error.
PER CURIAM. Judgment affirmed. *Page 358